PHYSICIANS & HOSPITALS SUPPLY COMPANY AND ANOTHER v. EDWARD WILLIAM JOHNSON.[1]

August 11, 1950.

No. 35,072.

---

[1]Reported in 44 N. W. (2d) 224.

*Mulder & Fassett* and *Thompson, Hessian, Fletcher & McKasy,* for appellant.

*Dorsey, Colman, Barker, Scott & Barber,* for respondent Physicians & Hospitals Supply Company.

FRANK T. GALLAGHER, JUSTICE.

This suit was brought by the Physicians & Hospitals Supply Company and the St. Paul-Mercury Indemnity Company[2] to compel defendant to account for $104,220.43, which it was alleged he embezzled during his employment by the supply company from 1934 to 1946. The supply company will hereinafter be referred to as if it were the sole plaintiff. Findings were made in plaintiff's favor in the amount of $101,916.13 plus $43,575.90 interest at six percent, computed to February 1, 1949. This appeal is from the order denying defendant's motion for amended findings or a new trial. We review only the order denying the motion for a new trial, the order denying the motion for amended findings not being appealable.

Defendant was a graduate of the course in accounting and business administration at the University of Minnesota. He had had a

[2]The St. Paul-Mercury Indemnity Company came into the case as having paid $5,000 to the supply company on defendant's surety bond.

little over two years' business experience as a credit and office manager prior to his employment in 1933 by plaintiff, at a salary of $175 a month.[3] His duties were numerous. With the exception of the purchasing and sales departments, he was in charge of office personnel, having the power to hire and fire. According to the testimony of the officers of plaintiff, he was responsible for the entire procedure of the office from the handling of an order when it came until it was billed, collected, or charged off. Plaintiff maintained an office staff of from 15 to 35 clerks to handle its voluminous business. In particular, there was an assistant bookkeeper, who did most of the actual bookkeeping. It could not well be otherwise in view of the multitude of duties which the officers of the company say they imposed on defendant. They testified that defendant had supervision over the cash receipts record, accounts receivable ledgers, journal and journal entries, deposit slips, and the allocation of payments to the various customers' accounts. Occasionally, he personally made entries in the books, filled out deposit slips, and sometimes made deposits at the bank, although he was criticized by a superior for doing detail work which could have been done by an assistant. He had supervision of the monthly statements. As credit manager, he was in charge of credit memoranda. Thus, when an order came in, an invoice would be written up by an office girl and given to him to approve the credit. He had control of the collection of charged-off accounts which he thought might still be collectible. He received cash and checks from customers and had access to all cash, as did his assistants. He went out on collections; wrote collection letters to customers; and took care of conditional sales contracts. He sometimes made changes in bookkeeping methods to promote efficiency. However, there were other employes, including the assistant bookkeeper, who had access to the cash, cashed checks for customers and employes, and made deposits and most of the entries in the books. Plaintiff did a business running into the millions during the time of defendant's employment. Throughout his

---

[3]Finally raised to $4,000 per annum.

period of employment defendant's duties remained the same. He was, however, neither an officer nor a director of the company.

December 23, 1946, defendant was discharged when plaintiff's officers learned that he was planning to go into a competitive business. Shortly thereafter, plaintiff discovered that a claim against the New York Central Railroad for $270 had been paid by the railroad, but no record of the payment had been made in plaintiff's books. This circumstance, together with defendant's admission that he had taken $1,000 of plaintiff's funds, led plaintiff to ask the firm of accountants who were its regular auditors and who had audited its books annually for many years to conduct a special audit covering the period from January 1, 1936, to December 23, 1946. As a result, the audit set up by them charged that a substantial amount of plaintiff's funds had come into defendant's possession through manipulations of the accounts, to be described in detail hereinafter.

While it is the position of plaintiff that because of the trust relationship defendant could be compelled to account for every item of the nearly $10,000,000 of receipts during his tenure of employment, it proceeded with its audit. In order to discover the amount of the alleged misappropriation of funds, the auditors prepared a schedule listing all checks shown on deposit slips for the period beginning January 1, 1936, to October 31, 1946, *which did not appear in the cash receipts record.* The aggregate of these checks was $206,726.02. From this figure, checks amounting to $95,957.60 were deducted because they were identified as either (1) cash sales; (2) employe and customer accommodation checks; (3) salesmen's expense advances; (4) salesmen's checks; (5) checks removed from deposits and deposited on subsequent days; or (6) checks from other parties received from customers in payment of customers' accounts. This left checks aggregating $110,768.42 which had been deposited, but no record of which the accountant could find in the books. From information, challenged as hearsay, obtained from the First National Bank of Minneapolis and customers of plaintiff, the auditors were able to identify checks totaling $20,920.71, the equivalent

of which they charged that defendant had taken in money from the cash on hand. These checks are listed in exhibit I of Record, Vol. II.[4]

Schedule A of exhibit I represents instances where it is asserted that merchandise was received and paid for by the customer but that no record of the transaction was made or entered on the company's books. In such cases, it is asserted that when the customer's check came to plaintiff an entry in the cash receipts record could have been avoided and defendant could have deposited the check to plaintiff's account at the bank and appropriated a like amount of cash without throwing the books off balance.

Schedules B through J purported to be a list of instances (1) where it was asserted that credit memoranda had been improperly used to credit a customer's account and the payment made by the customer was not recorded on the books; (2) where the customer made a duplicate payment for purchases and the duplicate payment was not returned to the customer or entered on the books; (3) where payments made by the customers whose accounts indicated a credit balance or credit items were not recorded on the books or were recorded in a reduced amount; (4) where payments were received from customers on charged-off accounts but the payments were not entered on the books; (5) where cash refunds from expense charges were received but the refunds were not entered on the books; (6) where the customer paid his account in full, but the payment was entered in the cash records, less discount, and the amount of discount appropriated; (7) where checks were entered on the bank deposit slips but not recorded on plaintiff's copy of the deposit or in the cash receipts register; (8) where checks which could not be

---

[4]Record, Vol. II, referred to in the record as exhibit B, is divided into two parts, namely, exhibit I and exhibit II. Originally, exhibit II consisted of all checks (amounting to $206,726.02) which did not appear in the cash receipts record. The total amount in exhibit I is $20,915.30; $15.09 was eliminated as a duplication of another item in the exhibit, and checks totaling $20.50 were later identified by the auditors as having been appropriated by defendant and were transferred from exhibit II to exhibit I. (See footnote 5.)

traced to recorded cash receipts had been substituted in the deposit for cash and recorded checks which in turn were substituted for cash in later deposits; (9) where checks which could not be traced to recorded cash receipts represented the amount of the sales price of varying quantities of proliferal, a drug.

In each instance, the investigators assert that the books were so manipulated that the incoming checks did not have to be recorded or could have been recorded in lesser amounts than the face value, with the result that defendant could have appropriated from cash either the full amount of the check or the difference between the face value and the recorded value.

After checks totaling $20,920.71 were identified by the auditors as being a part of the alleged manipulations, there remained checks totaling in excess of $80,000 which could not be identified as connected with either misappropriations or with accommodation checks, et cetera. (See the six categories listed on page 551, supra.) For instance, with the help of defendant, the auditors were able to eliminate $6,330.15, representing accommodation checks, and at the trial defendant's attorneys offered 33 of defendant's accommodation checks in the amount of $846.35; likewise, another group of accommodation checks in the amount of $1,680.79 was eliminated, reducing the total of unidentified checks to $80,995.42.

Summarizing these statements, the audit charged that checks in the amount of $20,920.71 went into plaintiff's bank account and that an identical amount of cash was taken by defendant from the cash on hand. It is in regard to these checks that there is evidence in the record tending to show an admission by defendant that he appropriated cash in the equivalent amount. Checks totaling $80,995.42 could not be identified as being a part of misappropriated funds or otherwise.[5] The trial court held that the burden

---

[5]Record, Vol. I, p. 571, plaintiff's exhibit Y. (See this footnote, infra.)

"Summary of Exhibit I and Exhibit II

As Revised

PHYSICIANS AND HOSPITALS SUPPLY COMPANY

January 25, 1949

was on defendant to account for this $80,995.42 item, as well as the $20,920.71.

The principal problems presented by this record reduce themselves to two: (1) Is there competent evidence supporting the find-

EXHIBIT I

| | Number of Checks | Amount |
|---|---|---|
| Total as originally listed.......................... | 424 | $ 20,915.30 |
| Less: | | |
| Item of F. J. Clark—3-17-45—Schedule D-8 .............................. | 1 | 15.09 |
| | 423 | $ 20,900.21 |
| Add: | | |
| Checks included with A. J. Lutzer group as being in payment of Dr. Chichister account but never credited on books (2-10-44=$10.00; 3-29-40=$5.50; 1-4-40=$5.00) ................ | 3 | 20.50 |
| TOTAL—EXHIBIT I AS ADJUSTED................ | 426 | $ 20,920.71 |

EXHIBIT II

| | Number of Checks | Amount |
|---|---|---|
| Total as originally listed as requiring investigation ............................. | 8,437 | $206,726.02 |
| Less items transferred to Exhibit I............... | 423 | 20,900.21 |
| | 8,014 | $185,825.81 |
| Less checks identified as representing: (1) Cash sales, (2) Employee and customer accommodation checks, (3) Salesmen's expense advances, (4) Salesmen's personal checks, (5) Checks removed from deposit and deposited on subsequent days, (6) checks of third parties received from customers in payment of customers' accounts .................................. | 2,326 | $ 95,957.60 |
| Checks on Exhibit II as completed................ | 5,688 | $ 89,868.21 |

ing that the items in exhibit I of exhibit B, amounting to $20,920.71, are properly chargeable to defendant? (2) Assuming, as we must, that the fiduciary relationship is established, where falls the burden of proof to establish that defendant had possession of the cash equivalent of the items in exhibit II of exhibit B, amounting to $80,995.42, which was charged to defendant in the audit?

■ The solution of the first question is very simple. There was evidence tending to prove that defendant admitted the misappropriation of the items in exhibit I. He did not take the stand to deny that admission. Even without the challenged testimony on the part of plaintiff in support of the items, the court would have been compelled to find that defendant was liable for these items. Hence, in view of his admissions, defendant could not have been prejudiced by the receipt in evidence of items supporting the exhibit or the exhibit itself. State v. McCauley, 17 Wash. 88, 49 P. 221, 51 P. 382; People v. Burgess, 244 N. Y. 472, 155 N. E. 745; General

| | | |
|---|---|---|
| Less additional accommodation checks eliminated (Geo. Ulmer, Jr., Peter DeVries, L. C. Pittelkow, E. W. Johnson, Kathryn Kullas) | 577 | 6,330.15 |
| | 5,111 | $ 83,538.06 |
| Less additional accommodation checks eliminated (E. W. Johnson) | 33 | 846.35 |
| | 5,078 | $ 82,691.71 |
| Less additional accommodation checks eliminated (Dorothy Loe, Hillman L. Roe, William E. Fraser, John G. Thompson, Edward W. Johnson, and A. J. Lutzer) | 231 | 1,675.79 |
| | 4,847 | $ 81,015.92 |
| Less checks transferred to Exhibit I (A. J. Lutzer's checks in payment of Dr. Chichester's account) | 3 | 20.50 |
| TOTAL—EXHIBIT II AS ADJUSTED | 4,844 | $ 80,995.42" |

Finance, Inc. v. Stratford, 71 App. D. C. 343, 109 F. (2d) 843; cf. Swanson v. Lindstrom, 151 Minn. 19, 185 N. W. 950.

■ The fact that the court may have received incompetent evidence in support of the items enumerated (a question we need not decide) does not vitiate its finding, based on competent and compelling evidence under the rule of Mankato Mills Co. v. Willard, 94 Minn. 160, 102 N. W. 202; Pump-It, Inc. v. Alexander, 230 Minn. 564, 42 N. W. (2d) 337.

■ When we come to exhibit II, covering $80,995.42 of the alleged appropriations, we are confronted with a far different problem. At the outset, plaintiff contends that, having established that defendant was office manager, credit manager, and chief accountant, it made out a prima facie case against defendant when it showed that the net sales during the period of defendant's employment were nearly $10,000,000, and it asserts that defendant can be required to account for every dollar of that sum. This appears to lead up to plaintiff's next contention that, because of the aforesaid trust relationship between the parties, defendant was bound to account for $206,726.02, the amount of the checks in exhibit B shown to have been deposited but not listed in the cash receipts record. Finally, plaintiff bases its case against defendant for the items in exhibit II on a so-called "pattern" theory. That is, it attempts to prove a shortage of $80,995.42 by drawing the inference that defendant appropriated the funds from a like amount of cash on hand because of the "pattern" of alleged misappropriations shown in exhibit I. This pattern theory is described by one of the auditors as follows:

"Q. You spoke during your cross-examination, I think more than once, about patterns. First of all, what do you mean by 'patterns'? What did you refer to when you spoke of 'patterns'?

"A. Well, a pattern is used in this instance meaning a consistent course of action. *We have the basic pattern of checks being on the deposit ticket* and not credited to the customer's account, and cash appropriated, currency appropriated in place of it, in order that the deposits and the books will balance. That is your basic

pattern here, the method that was followed in appropriating these funds. The pattern, then—the variations in the theme, were in the method of covering up the irregularity, in so far as the customer's account was concerned. The charges—there were unrecorded sales, charge-off accounts weren't—the money received on charge-off accounts wasn't credited, and we have, I think, seven or eight different methods by which the other side of the transaction was covered up. Basically, as stated, the method was that the checks that were included in the deposit, were not recorded on the cash receipts book, leaving an unaccounted for balance. The balance was offset by currency or checks in smaller denominations being removed from the deposit." (Italics supplied.)

The weakness in plaintiff's contentions is that they assume that defendant must account for all the items on the two lists on a mere showing of a confidential relationship, such as was shown in the case at bar, and the consequent responsibility over its finances. The assumption is erroneous. Before the duty of a fiduciary to account arises, it is essential that complainant establish not only the confidential or fiduciary relationship between the parties, but also the receipt by the fiduciary of the funds to be accounted for. Farmers' Warehouse Assn. v. Montgomery, 92 Minn. 194, 99 N. W. 776; Lahr v. Kraemer, 91 Minn. 26, 97 N. W. 418; Cafritz v. Corporation Audit Co. (D. C.) 60 F. Supp. 627; Wootton Land & Fuel Co. v. Ownbey (8 Cir.) 265 F. 91; Melconian v. Fraam, 265 Mich. 378, 251 N. W. 574; Pappathanos v. Coakley, 263 Mass. 401, 161 N. E. 804; Palmer v. Manville (Iowa) 228 N. W. 20; Oskaloosa Sav. Bank v. Mahaska County State Bank, 205 Iowa 1351, 219 N. W. 530, 60 A. L. R. 1204; Tierney v. Hotz, 141 N. J. Eq. 114, 55 A. (2d) 39. In the case at bar, plaintiff relies on the fiduciary relationship and the so-called "pattern" theory to prove receipt by defendant of all funds listed in exhibit II.

As for the "pattern" theory, one of its weaknesses lies in its assumption of a shortage and the assumption upon that assumption that there was a misappropriation by defendant. No shortage of $80,995.42, however, was ever shown. The "pattern" theory, stand-

ing alone, is just as applicable to the $206,726.02, first listed against defendant, as to the $80,995.42. The flaw in plaintiff's theory is that the record discloses that other persons than defendant had access to the cash on hand and cashed checks daily for the accommodation[6] of customers, salesmen, and other employes. Under the bookkeeping system then in operation, however, these checks were never recorded on the cash receipts record over a period of 13 years.[7] As to $95,957.60 of the $206,726.02, plaintiff itself showed that it represented accommodation items. Thus, it can be urged just as forcefully from the evidence that, because of the "pattern" of .cashing accommodation checks, the $80,995.42 item includes many such checks.[8]

What the "pattern" theory really attempts to do is to fasten upon defendant liability for these items because he took the bookkeeping system as he found it and did not establish a better system so that all the various transactions would be shown in detail.

[6]The record shows that another accountant, a woman, had considerable control over the books and cash. She made entries, filled out deposit slips, cashed checks for customers, made deposits in the bank, and supervised other employes. There is some evidence that she may have had as much responsibility over the books and cash as defendant, but since she was never called to testify we are left in doubt as to the exact nature of her duties.

[7]A number of letters in evidence replying to a circular which defendant sent to a few of plaintiff's customers and former employes tend to show that the writers cashed personal checks or checks in their possession at plaintiff's office. These checks were not identified and were eliminated from the $80,995.42 figure.

[8]As the bank did not retain its records made before 1944, it was unable to assist the auditors with information as to items which were allegedly appropriated *or not appropriated* during the years preceding January 1944. Even then, the bank could identify only checks in odd amounts. Consequently, since exhibit II contains a considerable number of checks for $5, $10, and $15, which are almost certainly the type of personal accommodation checks cashed by employes or customers, the list on its face, in a measure, impeaches plaintiff's pattern theory. For example, there are about 114 checks for $5, $10, $15, $20, $25, and $30 for the year 1946 (up to October 1).

In fact, under plaintiff's theory, any employe who deposited checks and had access to the cash could be made to account. The "pattern" theory leaves the proof of defendant's ever having possession of any part of the $80,995.42 in the realm of speculation.

For these reasons, the burden rests on plaintiff to produce evidence showing what funds came into defendant's possession. As this court observed in Raymond Farmers Elev. Co. v. American Surety Co. 207 Minn. 117, 122, 290 N. W. 231, 234, 126 A. L. R. 1351:

"* * * The rule is that the principal (used in the agency sense) must establish by a fair preponderance of the evidence that the agent has actually received the particular thing for which he is sought to be held."

Where, as in exhibit I, the evidence shows a series of manipulations of the books by which funds could have been taken and where there is undisputed evidence that defendant admitted that the exhibit was correct, we believe that plaintiff sustained its burden and that the court's findings are justified; but, as far as exhibit II covering the $80,995.42 item is concerned, we hold that plaintiff is not entitled to recover in the absence of competent proof that defendant received the sums listed. Cf. Raymond Farmers Elev. Co. v. American Surety Co. *supra.*

■ Defendant urges that the trial court erred in permitting admissions by defendant which it contends were made in the course of settlement negotiations between the parties. In our opinion, these admissions fall within the rule laid down by this court in Esser v. Brophey, 212 Minn. 194, 198, 3 N. W. (2d) 3, 5, where we said:

"Where, however, an admission of liability is made, it is admissible, although it is embraced in an offer of compromise. A common illustration is one where liability is admitted and the dispute relates to the amount due, as in Person v. Bowe, 79 Minn. 238, 82 N. W. 480."

However, in the case at bar, it seems clear that the admission was made in the course of an investigation rather than in negotiations for settlement.

The order denying a new trial is reversed.

ON PETITION FOR REARGUMENT.

On October 20, 1950, the following opinion was filed:

PER CURIAM.

Upon petition for rehearing, the last paragraph of the opinion of this court filed herein on August 11, 1950, is modified to read as follows:

"The order denying a new trial is reversed, except as to the items in exhibit I of exhibit B aggregating $20,920.71 plus interest at the legal rate thereon, for which items judgment is directed to be entered."

MR. JUSTICE THOMAS GALLAGHER took no part in the consideration or decision of this case.